DAVID MAYER BREWING Co., complainant-respondent,

*v.*

JOHN J. SHERIDAN and BRIDGET SHERIDAN, his wife, defendants-appellants.

[Submitted July 7th, 1919.    Decided November 17th, 1919.]

1. When real estate is purchased by a wife during coverture from a stranger, and a creditor claims it was paid for wholly or in part by moneys of the husband and in fraud of creditors, such creditor has the burden of proving that fraud.

2. Evidence examined and *held* to justify finding that the bulk of moneys deposited by a married woman in bank and later used as a cash payment on real estate purchased in her name, were derived from a saloon business conducted by her husband in his own name, and were his moneys.

On appeal from the court of chancery advised by Vice-Chancellor Lewis.

*Mr. John J. Fallon,* for the appellants.

*Mr. Harlan Besson,* for the respondents.

The opinion of the court was delivered by

PARKER, J.

The suit is to impress the lien of a judgment recovered by respondent company in 1908 against appellant John J. Sheridan, for $513.17 damages and costs, upon a saloon and residence property known as 500 Ferry street, Hoboken, occupied by said Sheridan as a saloon on the ground floor, and above by himself and his family as a dwelling. The legal title to the property stands in the name of the wife, to whom it was conveyed by a third party in 1915. The purchase price was $11,000, on which $6,000 was paid in cash, the remainder being left on mortgage. The cash payment was made with funds drawn from two bank accounts standing in the name of the wife, and the claim of the complainant is that this fund was wholly or mainly composed of money turned over to her by her husband out of current receipts in his saloon business, admittedly conducted in his name and by him in fact. If this claim is in accordance with the facts, it is obvious that *pro tanto* the property is that of the husband so far as relates to pre-existing creditors, and should therefore be subjected to the complainant's judgment. The vice-chancellor held that the moneys in bank were those of the husband and found for the complainant.

In deciding the case he held that it was within the general rule laid down in *20 Cyc. 754,* that "in a contest between the creditors of a husband and his wife, if the wife claims ownership during coverture, the burden of proof is on the wife to show that the purchase was for a valuable consideration paid by her out of her separate estate, or by some person other than her husband." But we think this language, as indicated by the context and by the decisions cited, relates to cases where the title

is derived by the wife through the husband. Such was the situation in all the decisions cited from this state in support of the text: *Ruppert* v. *Hurley, 47 Atl. Rep. 280; Post* v. *Stiger, 29 N. J. Eq. 554; Cramer* v. *Reford, 17 N. J. Eq. 367; Adoue* v. *Spencer, 62 N. J. Eq. 782.* But where the title comes directly to the wife from an outside source the burden of proof is the other way, and the creditor must show that the consideration came from him either directly or was money or property settled by him on his wife in hindrance or fraud of creditors. *Coyne* v. *Sayre, 54 N. J. Eq. 702.* The question, then, would seem to be whether the evidence supports the decree when the correct rule as to burden of proof is applied.

The defendants were married about 1889, and the husband started in business in Jersey City. The wife, according to her testimony, kept three or four boarders at $5 a week. She also kept a small candy and notion store, and testified that this returned a profit of $10 a week. There were one or two other minor sources of income besides housekeeping money contributed by her husband and which of course was his. In 1904 the husband rented the Hoboken property now in question, moved his family in, and began a saloon business there. He maintained the saloon also in Jersey City until about the time when complainants recovered their judgment, when he gave it up. The wife had ceased storekeeping some time before, and kept no boarders in Hoboken except her daughter and the daughter's husband at $8 per week.

The Hoboken saloon was apparently quite successful. Sheridan's bank account for July, 1908, is in evidence, and shows total deposits of over $1,200 not claimed to come from any other source. It stops abruptly July 28th, 1908; complainant's judgment was entered November 10th, 1908. The case is silent on financial conditions until January, 1911, except that Sheridan paid his beer account regularly, $60 to $80 a week. According to the brewery collector, the payment was in cash and checks of the railroad company (no doubt employes' checks cashed at the saloon—a common practice) and he got his money for the beer sometimes from Sheridan, sometimes from the bartender, and sometimes from Mrs. Sheridan, either upstairs in her rooms

or downstairs when she was dressed to go out, and perhaps had the money rolled up in a piece of paper.

"*Q.* She had the money in a piece of paper?.
"*A.* Yes.   She brought that down from upstairs and she paid the beer bill with that, and she had some check in that, perhaps."

The brewery account, which was put in evidence in supplementary proceedings and seems to be treated as part of the case, shows one hundred thirty-two half barrels of beer sold Sheridan in October, 1912, and in June, 1915, up to the 25th, one hundred twenty-five half barrels. In that month he had paid $437.79 and still owed $178.25, a total of $616.04. One hundred thirty-two half barrels a month make about four and one-half per day, including Sundays; and this seems to indicate a business of much activity and probable profit. In May, 1915, the brewery loaned, without security, $1,000 on a note signed by John J. Sheridan to the order of the brewing company and endorsed by Bridget. The check was payable to the order of John J. Sheridan. The note was paid off at the rate of $100 a month. Defendants claimed that this loan was specifically made to the wife, but at least the documents indicate the contrary.

From 1908 the husband kept no bank account; but beginning in January, 1913, the wife has had first one, and then two. An examination of these shows that she deposited in one or the other, quite regularly, often every week, sums varying from $100 to $300, amounting in 1911 to $1,400; in 1912 to $2,300; in 1913 to $2,296; in 1914, up to September, $700; in all, $6,696. In November, 1914, $2,600 was drawn out of one bank and $3,400 from the other, which make the $6,000 cash paid on the property. The brewery loan appears as a deposit May 20th, 1915, and a draft May 28th.

In September, 1912, she purchased real estate at Keansburg for $1,500, $1,200 of which appears to have been drawn from the savings bank September 6th.

When it is considered that Mrs. Sheridan was depositing in bank an average of $200 per month for two years and $100 a month for a year and a half in addition, it is legitimate to ask

where she obtained so much money, and if her circumstances and station in life do not afford a reasonable answer, and her own account of it does not commend itself as satisfactory, the inference is obvious that some one gave it, or most of it, to her. Her account is in our judgment quite unsatisfactory and sufficient in itself to cast suspicion on her ownership. The proceeds of· the little store, and· of keeping· boarders in her early married life are unimportant and remote. She claims that she set up her brother Timothy in the saloon business, and let him have $1,400; this was while she was keeping her little store. His health ·failed and he finally died, and she took back the saloon and resold it to. another brother for $2,680, represented entirely by notes. He made a failure of it also, as claimed, and testified that he simply surrendered it back to her, and yet later began to pay the notes, which were of $50 each, and the last one was paid, as claimed, some time in 1915. The evidence on this phase of the case is most unsatisfactory; but if accepted leaves some $4,000 of the bank deposits to be otherwise accounted for. There are only two deposits of $50 in the bank accounts, one on March· 31st, 1913, and one on November 5th, 1914, so that unless this brother paid two or four at a time we must·infer that Mrs. Sheridan added $50 from some other source to make a deposit of $100 and most of them are of that amount.

It is unnecessary to· multiply details; taking the evidence as a whole, the only reasonable conclusion is that Mrs. Sheridan was putting away money which some one was entrusting to her for that purpose. This conclusion reached, the whole situation points to her husband as that person. No one else is suggested or imaginable. . He was doing a profitable business; he kept no bank account, no books of account; he seemed to be somewhat loose in business methods; she was obviously ·thrifty and saving; and he had a judgment against him for beer which he testified caused his customers to leave him and made him close the Jersey City saloon; a state of things not calculated to impel him to pay the judgment. His wife evidently received the weekly surplus. Sometimes she paid the beer bill, as we have seen; but the profits she put away in bank. Leaving the general burden of proof on complainant, we conclude that it has been

satisfactorily shown that the bulk of the bank deposits consisted of money derived from the saloon business, and that the cash payment on the saloon property was made therefrom. The weekly board she received from her daughter and son-in-law— eight dollars—plus what her husband gave her for housekeeping, twelve dollars, allows of little margin after payment of food and clothing. There was an item of garage rent, $7 a month. The total per annum is insignificant.

Allowing the wife $2,680 of the fund as proceeds of sale of her saloon, she seems entitled, as of the date of purchasing 500 Ferry street, to no more. Savings from the housekeeping money and board of the daughter and her husband belong normally to Sheridan. *Garretson* v. *Appleton, 58 N. J. Law 386.* If the purchase be considered as hers, made in part with his money, the alleged renting by her to him and his payment of rent to her are at least colorable, and on that basis his creditors are entitled to look to an increment of his equity in the property by way of interest. For present purposes it is enough to say that he possesses an equity therein amply sufficient to satisfy complainant's claim. The result reached by the vice-chancellor, *i. e.,* that the land is subject to the lien of complainant below, is generally correct, at least to the extent of the proportionate interest represented by the husband's money paid on account of the purchase price. The decree, however, is not correct. It directs Bridget Sheridan to pay the complainant's claim with interest and costs, and costs of the supplementary proceedings, and a counsel fee; and that in default of such payment an execution issue against the premises in question. We do not think the costs of the supplementary proceedings are recoverable in this action; the statute provides that they shall be paid out of property recovered by the statutory receiver. *Comp. Stat. p. 2252 § 26.* More important is the form of the decree. It is erroneous to direct Mrs. Sheridan to pay her husband's debt. The proper course, after adjudging the amount of money belonging to the husband that went into the property, is to declare the complainant's judgment, with interest and the costs of the chancery suit, a lien on the property not to exceed the ascertained interest of the husband therein, namely, $4,000 and

interest from the date of purchase, and that in default of payment the property be sold to pay such claim. To this extent the decree should be modified; in other respects it is affirmed.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—13.

*For reversal*—None.